UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL P. KLAHN,<br><br>    Plaintiff,<br><br>    v.<br><br>DUBLIN POLICE DEPARTMENT, et al.,<br><br>    Defendants. | Case No. 16-cv-00833-JCS<br><br>**ORDER REGARDING SUFFICIENCY OF COMPLAINT PURSUANT TO 28 U.S.C. § 1915**<br><br>Re: Dkt. No. 1 |

## I. INTRODUCTION

Plaintiff Daniel P. Klahn Sr. brings this action against a variety of government officials and entities alleging violations of his statutory and constitutional rights over the course of his arrest in Dublin, California, transportation to San Diego, and prosecution in the California Superior Court for the County of San Diego. The Court previously granted Klahn's application to proceed in forma pauperis and now reviews the sufficiency of his Complaint pursuant to 28 U.S.C. § 1915(e)(2). As detailed below, the Court finds that Klahn may proceed on his claims against Monterey Sheriff's Deputy Ennis and on one claim against San Diego Assistant District Attorney Anna Winn. Klahn's remaining claims are DISMISSED, some with leave to amend and some without, as discussed below. If Klahn wishes to file an amended complaint, he must do so **no later than August 9, 2016**.[1]

## II. ALLEGATIONS OF THE COMPLAINT

Klahn's factual allegations are taken as true at the pleading stage, and are therefore recited here as if true. Nothing in this Order should be interpreted as resolving any factual issue that may

---

[1] Klahn has consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). Because no other party has been served or appeared, Klahn is currently the only party to the case and his consent is sufficient for the undersigned to evaluate his Complaint.

be disputed at a later stage.

## A. Investigation

In 2013, non-party Detective Aaron Dobbs—apparently of the San Diego Police Department—spoke to Klahn by telephone regarding a $1,250 check that Klahn had cashed. Compl. (dkt. 1) at 52.[2] Klahn explained that he had held a job where he recovered unclaimed funds slated to escheat to the state, and a Mr. Meyerson, with whom he worked, had agreed that Klahn could keep ten percent of the funds he recovered. *Id.* at 52–53. Dobbs told Klahn that the check was forged, and Klahn responded that he often received authority from Meyerson via email to sign checks on his behalf, although he did not recall the circumstances of that specific check. *Id.* at 53. When Dobbs became angry with Klahn, Klahn said that he did not think Meyerson would want to take Klahn to court because Klahn was aware of illegal conduct by Meyerson and other damaging information that would come to light in court proceedings. *Id.* Klahn said that he would meet with Dobbs when he visited San Diego the next week, but Dobbs was not at the police station when Klahn visited. *Id.* Klahn left Dobbs a voice message but never heard from him again. *Id.*

## B. Arrest

On February 8, 2014, two officers of the Dublin Police Department came to Klahn's house in Dublin, California, ostensibly to investigate a police report that Klahn had filed two to three years before in Dublin. Compl. (dkt. 1) at 10. Klahn told the officers that he had not filed such a report and did not live in Dublin at the time. *Id.* The officers nevertheless repeatedly asked to come into the house to discuss the report, and Klahn repeatedly refused to grant them permission to enter. *Id.* One officer asked to see Klahn's identification and followed him into the house when Klahn went to retrieve his wallet, telling Klahn that he needed to stay with him for the officers' safety. *Id.* Klahn asked him to leave and the officer returned to the porch. *Id.*

---

[2] Although Klahn's Complaint is made up of numbered paragraphs, many paragraphs span several pages, and the numbering scheme resets at each section. This Order therefore cites the Complaint by page number to avoid confusion. For the convenience of the Court and all parties, Klahn is encouraged to use short, continuously numbered paragraphs if he chooses to file an amended complaint.

2

Klahn asked the officers if they had a warrant, and one officer responded that they did not need one. *Id.* The officers did not respond to Klahn inquiring about "the real reason for their visit." *Id.* One officer eventually said they would discuss the matter with Klahn if he let them inside, but Klahn declined to do so. *Id.* The officers then pushed through the door and restrained Klahn against a counter. *Id.* at 10−11. When Klahn asked again to see a warrant, one of the officers produced "a business card size piece of paper with his name, and pick-up late on the holiday weekend printed on it," and told Klahn that was the warrant. *Id.* at 11. In response to questions from Klahn, the officers told him that he was under arrest and that they did not have to inform him of the charges against him. *Id.* The officers helped Klahn shut down his computer and allowed him to get a jacket, and then escorted him to a police car and drove him to the Santa Rita Jail. *Id.* Once there, around 9:45, one of the arresting officers took Klahn to the booking area and asked him a series of questions regarding whether Klahn participated in theft or check forgery in San Diego. *Id.* The officer did not inform Klahn of his rights or of the charges against him. *Id.* at 11−12.

### C. Detention at Santa Rita Jail

The arresting officers left Klahn with a booking officer at the jail. *Id.* at 12. Klahn asked repeatedly to be allowed to call his attorney and family, but was told first that he could make a call after booking was complete, and then later told that he could make a call the next morning. *Id.* The booking officer also told Klahn that "San Diego" had not yet sent the arrest warrant, and that he did not know the exact charges against Klahn. *Id.* Klahn informed a medical intake officer that he was diabetic and needed medication, among other medical information. *Id.* The intake officer told Klahn that the medical department would see him in the morning, and sent him to a cell at 12:45 a.m. with a sack lunch and no medication, even after Klahn complained that he was not feeling well and needed insulin. *Id.* at 12−13.

At 6:00 a.m. the next morning, a nurse examined Klahn and determined that his "blood sugar . . . was over 200," but that he would have to see a doctor before he could receive medication. *Id.* at 14. Later that morning, Klahn asked to make a telephone call, but the officer on duty told him that he could not do so because a PIN number had not been configured for him, and

it would not be possible to set up a PIN number at that time. *Id.*

Klahn felt faint later that day, his feet swelled, and he became agitated. *Id.* An officer referred Klahn to the same nurse he saw in the morning, who measured his blood sugar level at "over 250" but again declined to give him medication and told him he would need to see a doctor. *Id.* According to Klahn, the next day—Monday, February 10, 2014—was a holiday, and no doctor was available. *Id.* Klahn became weak, dizzy, and more anxious. *Id.* at 14−15. On Tuesday, a doctor gave Klahn metformin but no insulin. *Id.* at 15. Klahn felt weak and had difficulty concentrating, and eventually experienced neuropathy and severe pain in his feet and hands. *Id.* at 15, 16.

Klahn continued to ask to make a telephone call, but a duty officer again told him that there was no way to assign him a PIN number. *Id.* at 15. Klahn's wife, unaware of his arrest, called the Dublin Police Department to file missing person report, but was not informed that he had been arrested and was being held in jail. *Id.* Klahn contends that if he had been given a telephone call, he could have contacted an attorney and informed his family of his arrest, and might have been able to obtain medication or post bail. *Id.*

### D.    Detention at Monterey County Jail

On the morning of Wednesday, February 12, the Orange County Sheriff's Department picked Klahn up from the Santa Rita Jail and transferred him to the Monterey County Jail. *Id.* at 16. At that time, Klahn had not been allowed to make a telephone call, had not been shown a warrant, did not know the charges against him, and had received only a single dose of metformin. *Id.* He remained at the Monterey County Jail for about twenty-two hours with another inmate in a small cell that was not large enough for two people, which had a solid metal door, a broken faucet not suitable for drinking from, and a painted shut air vent. *Id.* at 17−18. He received "one sack lunch, no water and no medication" during that time." *Id.* at 20.

Before his arrest, a kidney specialist had advised Klahn to drink ten bottles of water per day as part of a treatment regimen. *Id.* at 18. At the Monterey County Jail, Klahn began to urinate blood due to dehydration. *Id.* He was unable to stand due to dizziness and swelling in his feet and hands, and experienced pain even when seated. *Id.* Deputy Ennis of the Monterey County

Sheriff's Office refused to open a "pass door" to allow air to flow into the cell. *Id.* Another deputy later opened the "pass door" to allow for air flow, but Ennis closed it five minutes later and gave Klahn a "nasty look." *Id.* at 20. Ennis concealed his badge when Klahn asked for his name, but Klahn was able to see it during other interactions. *Id.* When Klahn and his cellmate used an emergency intercom to complain of the heat, lack of air and water, and Klahn's symptoms, another officer told them not to use the intercom again unless one of them had passed out. *Id.* at 18−19. Ennis later laughed at Klahn's request for medication and joked to a colleague "that Klahn actually thinks he has rights," but said that he would get a nurse to visit, and shrugged off the inmates' complaint about their faucet and request for water. *Id.* at 19.

Klahn saw a nurse late that night, who complained about being called back to work to examine him. *Id.* at 19. The nurse measured his blood sugar level at "over 300," but told him that was "not too bad" and that he should not call for her again that night. *Id.*

### E. Further Transportation and Detention

The Orange County Sheriff's Department picked Klahn up from the Monterey County Jail on February 13, 2014 and transported him to the Orange County Jail, where he was held for one night. *Id.* at 20−21. From there, the San Diego Sheriff's Department moved him first to Central Jail in San Diego, and then to the Vista Detention Center. *Id.* at 21−22. Although Klahn alleges that he suffered deprivations and mistreatment in these facilities similar to the experiences described above, he does not name any defendants associated with them. *See id.* at 20−22. This Order therefore does not summarize those allegations in detail.

### F. Court Proceedings

Klahn was arraigned on February 19, 2014. *Id.* at 23. The attorney who represented him at that proceeding never spoke to him, but entered a "not guilty" plea on his behalf. *Id.*

When Klahn met with Defendant Laura Copsey, a public defender, in preparation for a March 10, 2014 bail reduction hearing, he disputed the authenticity of the evidence against him (specifically, an email that he purportedly sent to Meyerson) and gave her a list of witnesses he wanted to call and documentation he wanted to obtain through discovery. *Id.* Copsey told Klahn that it would not be necessary to examine Klahn's laptop, which Klahn had argued would support

5

his view of his email exchange with Meyerson. *Id.* At the hearing, Klahn contends that Defendant Winn, an assistant district attorney, misrepresented a motion that Klahn had filed on his own behalf as, instead, a letter that Klahn had sent to Winn admitting criminal conduct and describing a violent confrontation with the Dublin police officers who arrested him. *Id.* at 23−24. Klahn objected but the judge, Defendant Michael Popkins, instructed him to remain silent. *Id.* at 24. Rather than disputing Winn's characterization of that document and of the purported email to Meyerson, as Klahn would have liked, Copsey instead requested that bail be set at $75,000 on the basis that Klahn had liver cancer, which was not true and which Klahn had never claimed. *Id.* at 24−25. Judge Popkins kept bail at $500,000, which Klahn could not afford to post. *Id.* at 23, 25.

Klahn's next hearing related to his speedy trial rights. *Id.* at 25−26. Copsey did not show up for a meeting with Klahn in advance of that hearing because she was busy. *Id.* at 25. Klahn felt that he had, or could obtain through discovery, sufficient evidence of his innocence, but Copsey refused to request discovery, instead advising Klahn to wait and see how the prosecutor handled the case. *Id.*[3] Copsey did not attend the hearing, and an assistant who appeared in her place waived Klahn's right to a speedy trial without speaking to him about it. *Id.* Klahn interrupted to say that he had never met that attorney and did not wish to waive his right; Judge Popkins reprimanded him and told him that he was not allowed to speak at the hearing, but instructed the public defender to confer with him. *Id.* The public defender told Klahn that Copsey would not be able to represent him if he insisted on a speedy trial. *Id.* When Klahn responded that he had provided Copsey with everything necessary to move forward to trial, the public defender told him that was "too bad," and told Judge Popkins that Klahn was waiving his right to a speedy trial. *Id.* at 25−26. Judge Popkins asked Klahn if he agreed, but when Klahn "began to say no," Judge Popkins nevertheless accepted the waiver with "reluctance." *Id.* at 26. Klahn attempted to explain that he did not wish to waive his right, but Judge Popkins reprimanded him again and told Klahn that he would shut off Klahn's microphone if Klahn continued to speak. *Id.*

Klahn requested to dismiss Copsey as his attorney and represent himself. *Id.* Judge

---

[3] It is not clear from the Complaint whether Copsey rescheduled her meeting with Klahn or if this communication took place via email. *See* Compl. at 25.

1    Popkins denied the request, stating that Copsey was performing adequately and the Klahn could
2    not represent himself. *Id.*
3         After Judge Popkins declined to let Klahn represent himself, Klahn borrowed money to
4    hire a private attorney, non-party James Dicks. *Id.* Dicks negotiated a plea deal with Winn and
5    presented it to Klahn on April 23, 2014, telling Klahn that he would be convicted if the case went
6    to trial and would face up to ten years in prison. *Id.* at 27. The agreement called for a sentence of
7    three years. *Id.* Dicks told Klahn that he had ten minutes to decide whether to accept the deal, and
8    that it was too late to obtain discovery if the case went to trial. *Id.* Klahn signed the agreement,
9    but now contends that he would not have received a ten year sentence if the case had gone to trial,
10   and that he would not have taken the deal if he had known that. *Id.*
11        According to Klahn, the plea agreement called for him to serve his full sentence in San
12   Diego and not in a state prison, but he was nevertheless transferred to a state prison in violation of
13   the agreement. *Id.* at 28. Klahn also contends that he was not informed that he would be required
14   to pay a large amount of restitution. *Id.* Judge Popkins did not allow Klahn to attend the
15   restitution hearing on June 6, 2014, where Dicks accepted a judgment of $285,000 and ten percent
16   interest against Klahn. *Id.* Dicks, the court, and the district attorneys' office all did not respond to
17   letters from Klahn and inquiries from his wife requesting a copy of the plea agreement and seeking
18   to void the deal based on the restitution amount and Klahn's transfer to state prison. *Id.*
19        **G.    Claims**
20        Klahn's Complaint includes eight claims: one claim under the Fourth Amendment to the
21   United States Constitution for a warrantless arrest, *id.* at 29; two claims under the Sixth
22   Amendment, for denial of assistance of counsel and infringement of the right to a speedy trial,
23   respectively, *id.* at 29−33; one claim under the Fourteenth Amendment for denial of due process
24   and equal protection, based on the infringement of various protections established by the
25   California Penal Code, including the right to make three telephone calls, *id.* at 33−36; a claim
26   under the Eighth Amendment for cruel and unusual punishment, *id.* at 36−50; a claim under 42
27   U.S.C. § 1983, *id.* at 50−54; a claim for attorney malpractice based on the standards set by the
28   State Bar of California and the California Business and Professions Code, *id.* at 54−62; and a

7

claim under sections 673 and 2652 of the California Penal Code for cruel and unusual punishment, *id.* at 62−63.

Klahn names the following Defendants: the Dublin Police Department, the Alameda County Sheriff's Department, Judge Michael J. Popkins, Alameda County Sheriff Gregory J. Ahern, the Santa Rita Jail, the Monterey County Sheriff's Department, Monterey County Sheriff Steve Bernal, San Diego District Attorney Bonnie Dumanis, Assistant District Attorney Anna Winn, the San Diego Office of the Public Defender, Laura Copsey, and Monterey County Sheriff's Deputy Ennis. *Id.* at 1−9. He seeks compensatory damages of $784,000 for his inability to prosecute or defend a number of civil suits while incarcerated, continuing damages for harm to his reputation and livelihood, consequential damages for ongoing harm to his health and mental state, punitive damages against Winn and Copsey, and injunctive relief consisting of a referral of Win and Copsey to the State Bar and criminal charges against Ennis, Winn, and the intake officers at the Santa Rita Jail. *Id.* at 66−69.

### III. ANALYSIS

#### A. Legal Standard

Where a plaintiff is found to be indigent under 28 U.S.C. § 1915(a)(1) and is granted leave to proceed in forma pauperis, courts must engage in screening and dismiss any claims which: (1) are frivolous or malicious; (2) fail to state a claim on which relief may be granted; or (3) seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *see Marks v. Solcum*, 98 F.3d 494, 495 (9th Cir. 1996). Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that lacks such statement fails to state a claim and must be dismissed.

In determining whether a plaintiff fails to state a claim, the court assumes that all factual allegations in the complaint are true. *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995). However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to legal conclusions [and] mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The pertinent

8

question is whether the factual allegations, assumed to be true, "state a claim to relief that is plausible on its face." *Id.* (citing *Twombly*, 550 U.S. at 570). Thus, to meet this requirement, the complaint must be supported by factual allegations. *Id.*

Where the complaint has been filed by a pro se plaintiff, as is the case here, courts must "construe the pleadings liberally . . . to afford the petitioner the benefit of any doubt." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (citations omitted). "A district court should not dismiss a pro se complaint without leave to amend unless 'it is absolutely clear that the deficiencies of the complaint could not be cured by amendment.'" *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (quoting *Schucker v. Rockwood*, 846 F.2d 1202, 1203−04 (9th Cir. 1988) (per curiam)). Further, when it dismisses the complaint of a pro se litigant with leave to amend, "the district court must provide the litigant with notice of the deficiencies in his complaint in order to ensure that the litigant uses the opportunity to amend effectively." *Id.* (quoting *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992)). "Without the benefit of a statement of deficiencies, the pro se litigant will likely repeat previous errors." *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 624 (9th Cir. 1988) (quoting *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir. 1987)).

### B. Penal Code Sections 673 and 2652

Klahn brings a claim under two sections of the California Penal Code that prohibit cruel and unusual punishment in state institutions. Compl. at 62−63 (citing Cal. Penal Code §§ 673, 2652). By their terms, those statutes establish grounds for the state to bring misdemeanor criminal charges against officials who violate them; they do not create any private right of action. *See* Cal. Penal Code §§ 673, 2652; *see also*, *e.g.*, *Jones v. Virga*, 2012 WL 1868669, at *4 (E.D. Cal. 2012) (dismissing a claim based on section 673 because a "private right of action under a criminal statute has rarely been implied," and "California Penal Code § 673 includes no provision for civil enforcement of any kind that is available to plaintiff"). This claim is therefore DISMISSED with prejudice.[4]

---

[4] Even if Klahn could bring a claim under these statutes, it would be subject to California's requirement that a plaintiff bringing a tort claim against government entities or officials must first present a written claim to the entity. *See* Cal. Gov't Code §§ 945.4, 950.2. There is no indication in the Complaint that Klahn has complied with that requirement.

As for Klahn's request for injunctive relief in the form of criminal charges against various defendants, the decision of when to bring criminal charges under the California Penal Code rests with state law enforcement officials. This Court has no authority to order the relief that Klahn seeks.

### C. 42 U.S.C. § 1983

Klahn brings the bulk of his claims under 42 U.S.C. § 1983 or various amendments to the United States Constitution. Section 1983 is the statutory vehicle for bringing constitutional claims against state and local government officials, and the Court construes such constitutional claims as brought under § 1983 regardless of whether a complaint invokes that statute explicitly. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). With the exception of the Penal Code claims dismissed above and the attorney malpractice claims addressed below, all of Klahn's claims must therefore be analyzed in the context of § 1983.

Because the primary question before the Court at this stage is whether (and thus, on whom) the Complaint should be served, the analysis below is organized by the Defendants named in the Complaint.

### D. Claims Against Judge Popkins

"Judges are immune from damage actions for judicial acts taken within the jurisdiction of their courts." *Ashelman v. Pope*, 793 F.2d 1072, 1075 (9th Cir. 1986) (citing *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1872)). In contrast to the qualified immunity applicable to most government officials, judicial immunity is absolute; it "applies 'however erroneous the act may have been, and however injurious in its consequences it may have proved to the plaintiff.'" *Id.* (quoting *Cleavinger v. Saxner*, 474 U.S. 193, 199−200 (1985) (quoting *Bradley*, 80 U.S. (13 Wall.) at 347)). Although Klahn asserts that the misconduct he alleges—including accepting a waiver of speedy trial rights over Klahn's objection, failing to consider a motion to dismiss, and not allowing Klahn to represent himself—"were not errors within [Popkins's] prescribed duties as a judge," Compl. at 3, the Court disagrees. All of Klahn's claims against Judge Popkins are based on judicial acts plainly related to his judicial role in a case within the jurisdiction of his court. *See Ashelman*, 793 F.2d at 1075−76 (listing factors to be considered in determining whether an action

1   is judicial).  Such claims are therefore DISMISSED with prejudice.

**E.  Claims Against Winn and Dumanis**

"Prosecutors are also entitled to absolute immunity from section 1983 claims." *Id.* at 1075 (citing *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976)).  Such immunity applies to a "prosecutor who acts within the scope of her duties in initiating and pursuing a criminal prosecution and in presenting the State's case," but is reduced to mere qualified immunity where a prosecutor steps outside of that role and instead, for example, "acts as a witness rather than as an advocate" by signing a sworn affidavit of probable cause.  *Jianjun Xie v. Oakland Unified Sch. Dist.*, No. C 12-02950 CRB, 2013 WL 812425, at *5 (N.D. Cal. Mar. 5, 2013) (citing *Imbler*, 424 U.S. at 420; *Kalina v. Fletcher*, 522 U.S. 118, 130−31 (1997)).  Although a "prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity," "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur *in the course of his role as an advocate* for the State, are entitled to the protections of absolute immunity."  *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (emphasis added).

Here, all of Winn's conduct related to initiating criminal proceedings against Klahn, advocating for higher bail than Klahn believed was warranted, and negotiating a plea agreement fall within her "role as an advocate for the State" and are protected by absolute prosecutorial immunity.  *See id.*; *see also* Compl. at 6−8.  That conduct is immune to suit under § 1983 regardless of whether Winn acted reasonably, and regardless of the motivation for her actions.  Klahn argues that Winn waived her immunity by acting as an investigator.  Compl. at 6−7.  Although actions taken outside of a prosecutor's role as an advocate are not immune, such actions do not waive immunity for other conduct taken within that role.  Klahn's claims against both Winn and Dumanis based on Winn's conduct as a prosecutor are therefore DISMISSED with prejudice and without leave to amend.

Winn's alleged involvement in Klahn's arrest poses a closer question.  Where a prosecutor "provid[es] advice to the police, the prosecutor act[s] to guide the police, not to prepare [her] own case," and is therefore not protected by absolute immunity.  *Buckley*, 509 U.S. at 285 (discussing

11

*Burns v. Reed*, 500 U.S. 478, 482 (1991)). Without prejudice to any argument that Winn may make after being served, the Court holds for the purpose of the present review that instructing police officers in how to arrest a suspect falls outside the scope of a prosecutor's absolute immunity.

According to Klahn, Winn "requested Dublin Police to arrest Klahn with special instructions not normally dictate for arrest and without a warrant," including instructions to arrest Klahn at the beginning of a holiday weekend so that he would remain in jail without arraignment for an extended period of time. Compl. at 35, 39; *see also id.* at 30 ("[Winn] elected to instruct without a warrant for the Dublin Police to conduct a warrantless arrest at an inconvenient time and date so to cause direct harm to [Klahn]."). The Supreme Court has held that "that the Fourth Amendment forbids arresting a suspect inside his home unless the police first obtain an arrest warrant or an exception to the warrant requirement applies." *United States v. Nora*, 765 F.3d 1049, 1054 (9th Cir. 2014) (discussing *Payton v. New York*, 445 U.S. 573, 590 (1980)). No such exception appears on the face of Klahn's Complaint. Accordingly, taking Klahn's allegations as true, Winn participated in violating Klahn's right to be free of unreasonable seizure under the Fourth Amendment by instructing police officers to arrest him at his home without a warrant. The Court finds this allegation sufficient at this early stage of review to proceed on a § 1983 claim against Winn.[5]

### F. Claims Against Public Defenders

"[A] public defender does not act under color of state law when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding," and is therefore not subject to suit under § 1983. *Polk County v. Dodson*, 454 U.S. 312, 325 (1981). All of Klahn's allegations regarding Copsey and the San Diego Office of the Public Defender relate to his counsel's conduct in representing him. *See* Compl. at 8 (summarizing claims against Copsey and the Office of the Public Defender); *id.* at 50−54 (summarizing Copsey's alleged wrongdoing in the

---

[5] There is no allegation that Dumanis participated in any way in instructing the police regarding Klahn's arrest. All of Klahn's claims against Dumanis are dismissed with prejudice based on absolute prosecutorial immunity.

1   context of a claim brought under § 1983).  Such conduct cannot give rise to a claim under § 1983,

2   regardless of whether Copsey or any other attorney erred in their representation of Klahn.  *Cf.*

3   *Dodson*, 454 U.S. at 325 (listing administrative functions such as hiring and firing as examples of

4   public defenders' conduct that might be under color of state law).  Accordingly, Klahn's § 1983

5   claims against Copsey and the Office of the Public Defender are DISMISSED without leave to

6   amend.

7         Further, any deficiency in Klahn's representation in San Diego is not appropriate for

8   joinder in a single lawsuit with the claims related to his arrest and detention.  Rule 20 of the

9   Federal Rules of Civil Procedure allows permissive joinder of multiple defendants where "(1) a

10  right to relief is asserted against each defendant that relates to or arises out of the same transaction

11  or occurrence or series of transactions or occurrences; and (2) some question of law or fact

12  common to all parties arises in the action."  *Sua v. Espinda*, No. 09-cv-0592 SOM, 2010 WL

13  184314, at * 2 (D. Hawaii Jan. 19, 2010) (citing Fed. R. Civ. P. 20(a)(2)).  Thus "[u]nrelated

14  claims involving different defendants belong in different suits."  *Id.* (citing, *e.g.*, *Aul v. Allstate*

15  *Life Ins. Co.*, 993 F.2d 881, 884 (9th Cir.1993)).  When there is a misjoinder of parties or claims,

16  the court may on its own motion drop any party or sever any claim.  *Id.* (citing Fed. R. Civ. P. 21).

17  Here, there is no factual overlap between Klahn's experience being arrested and transported to San

18  Diego and his experience in court once there.  Klahn's state law malpractice claim is therefore

19  DISMISSED without leave to amend, but without prejudice to bringing such a claim separately in

20  an appropriate court.

21        **G.**    **Claims Against Entities and Supervisors**

22        The following defendants are non-individual local government entities: (1) the Dublin

23  Police Department, Compl. at 2; (2) the Alameda County Sheriff's Department, *id.* at 2−3; (3) the

24  Santa Rita Jail, *id.* at 4; (4) the Monterey County Sheriff's Department, *id.* at 4−5, and (5) the

25  County of San Diego Office of the Public Defender, *id.* at 8.  The Supreme Court has long held

26  that "a local government may not be sued under § 1983 for an injury inflicted solely by its

27  employees or agents," but instead only for injuries caused by "a government's policy or custom,

28  whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy," *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 693 (1978), including cases where the "failure to train [its law enforcement officers] amounts to deliberate indifference to the rights of persons with whom the police come into contact," *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).[6]

      Klahn's Complaint does not identify any official policy or custom that led to a violation of his rights. He does include conclusory allegations that some of these entities are "liable for not properly supervising and/or training" their employees and officers. *See, e.g.*, Compl. at 2 (making such allegations against the Dublin Police Department). Such "conclusory statements" are not sufficient to state a claim. *See Iqbal*, 556 U.S. at 678. If Klahn wishes to bring a claim based on failure to train, he must include more specific factual allegations regarding deficiencies in the institutional defendants' training of their employees, sufficient to support a plausible inference that such failure amounts to deliberate indifference to the rights of arrestees or detainees. *See City of Canton*, 489 U.S. at 388. All claims against these defendants are therefore DISMISSED with leave to amend, except for the claims against the Office of the Public Defender, which are dismissed without leave to amend for the reasons discussed above.

      Klahn's Complaint also names three defendants based on their role as supervisors: Alameda County Sheriff Gregory J. Ahern, Monterey County Sheriff Steve Bernal, and San Diego County District Attorney Bonnie Dumanis. Compl. at 4−6. As discussed above, all of Klahn's claims against Dumanis relate to her supervision of Winn's conduct as an advocate on behalf of the state, and must be dismissed with prejudice based on absolute prosecutorial immunity. That leaves Sheriffs Ahern and Bernal, both of whom Klahn names as defendants in their official capacities. *See* Compl. at 4 ("Ahern is being sued in his official capacity as the supervisor of all Sheriff's [sic] within the County of Alameda to include Santa Rita Jail."); *id.* at 5 ("Bernal is being sued in an official capacity as the person responsible for the Sheriff's [sic] of Monterey County and their behavior and acts."). "Suits against state officials in their official capacity [are] treated

---

[6] The Court is aware of no authority supporting Klahn's assertion that the Dublin Police Department "assum[ed] full liability" by not responding to a letter asking it to disclose the names of the officers who arrested him. *See* Compl. at 2.

as suits against the State," and subject to the same requirement that an injury must arise from an official policy or custom discussed above under *Monell*. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). The claims against Ahern and Bernal are therefore also DISMISSED with leave to amend.

Supervisory officials may in some circumstances be liable in their personal capacity. Klahn appears to have chosen not to bring such a claim against Sheriffs Ahern and Bernal in his current Complaint. *See* Compl. at 4−5. If he chooses to do so in amended complaint, he must allege facts sufficient to show either "(1) [the supervisor's] personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citation and internal quotation marks omitted).

Because Klahn's claims against entities and supervisors are procedurally insufficient, the Court need not address at this time whether Klahn's allegations regarding mistreatment not attributed to any individual defendant, such as the intake officers' refusal to allow him to make a telephone call from jail or the nurses' failure to provide him with medication, are sufficient to support a claim under § 1983.

### H.  Claims Against Ennis

Deficient prison conditions can support a § 1983 claim based on violations of prisoners' Eighth Amendment right to be free of cruel and unusual punishment where "prison officials were deliberately indifferent to their health or safety by subjecting them to a substantial risk of serious harm." *Vaughn v. Rowland*, 79 F.3d 1155 (9th Cir. 1996). Klahn alleges that Defendant Ennis refused Klahn's and his cellmate's requests for ventilation and water, closed a vent that another deputy had opened to provide airflow, joked about Klahn's request for medical treatment and failed to secure timely medical treatment, and obscured his badge to prevent Klahn from learning his name. The Court finds those allegations sufficient for the purpose of 28 U.S.C. § 1915 to state a § 1983 claim for an Eighth Amendment violation.

### IV.  CONCLUSION

For the reasons stated above, Klahn's claims against Defendants Michael Popkins, Bonnie Dumanis, Laura Copsey, and the San Diego Office of the Public Defender are DISMISSED

without leave to amend. Klahn's claims against Defendant Anna Winn are DISMISSED without leave to amend, except for his claim that Winn violated Klahn's Fourth Amendment rights by instructing police officers to arrest him without a warrant, which is allowed to proceed. Klahn's claims against Defendants Gregory Ahern, Steve Bernal, the Dublin Police Department, the Alameda County Sheriff's Department, the Monterey County Sheriff's Department, and the Santa Rita Jail are DISMISSED with leave to amend. Klahn may proceed on his § 1983 claims against Monterey Sheriff's Deputy Ennis.

If Klahn wishes to file an amended complaint, he may do so **no later than August 9, 2016.** The first amended complaint must include the caption and civil case number used in this Order (16-cv-0833-JCS) and the words FIRST AMENDED COMPLAINT on the first page. Because an amended complaint completely replaces the previous complaint, any amended complaint must include all the claims Klahn wishes to present and all of the defendants he wishes to sue. *See Ferdik*, 963 F.2d at 1262. Any amended complaint must address the deficiencies discussed above, and may not do any of the following: (1) incorporate material from the prior complaint by reference; (2) include claims against Popkins, Dumanis, Copsey, or the San Diego Office of the Public Defender; (3) include claims against Winn based on her role as an advocate in Klahn's prosecution; or (4) include claims under California Penal Code sections 673 or 2652.

Alternatively, should Klahn wish to proceed without amendment against only Defendants Winn and Ennis, the Court will instruct the United States Marshal to serve the existing Complaint on those Defendants if no amended complaint is filed by the deadline stated above.

Klahn, who is not represented by counsel, is encouraged to consult with the Federal Pro Bono Project's Legal Help Center in either of the Oakland or San Francisco federal courthouses for assistance if he continues to prosecute this action. The San Francisco Legal Help Center office is located in Room 2796 on the 15th floor at 450 Golden Gate Avenue, San Francisco, CA 94102. The Oakland office is located in Room 470-S on the 4th floor at 1301 Clay Street, Oakland, CA 94612. Appointments can be made by calling (415) 782-8982 or signing up in the appointment book located outside either office, and telephone appointments are available. Lawyers at the Legal

/ / /

Help Center can provide basic assistance to parties representing themselves but cannot provide legal representation.

**IT IS SO ORDERED.**

Dated: July 12, 2016

_____
JOSEPH C. SPERO
Chief Magistrate Judge